**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
*Northern Division*

|  |  |
|---|---|
| WENDY TRICE | : |
| | : |
| | : |
| Plaintiff, | :   Civil Action No.:  1:19-cv-3272-GLR |
| v. | : |
| | : |
| OLIVERI & ASSOCIATES, LLC | : |
| | : |
| Defendant. | : |
| | : |
| | : |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT OLIVERI
& ASSOCIATES, LLC'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR
SUMMARY JUDGMENT**

Plaintiff Wendy Trice ("Plaintiff"), by and through undersigned counsel, hereby opposes

Defendant Oliveri & Associates, LLC's  ("Oliveri" or "Defendant") Motion to Dismiss the

Complaint, or in the Alternative, for Summary Judgment.  In opposition to the Motion, Plaintiff

states:

**INTRODUCTION**

Defendant's Motion relies on nothing more than misunderstanding of the law,

misdirection, and untested factual assertions.  Defendant styles its premature Motion as a motion

for summary judgment, a transparent effort at an end run around the discovery process.  Not only

does the Motion require numerous factual determinations; it also fails to stand on the merits.

Oliveri's collection efforts, distinct in substance and character, easily fall within the Fair

Debt Collection Practices Act's ("FDCPA") statute of limitations.  Though Oliveri (incorrectly)

asserts that this case turns entirely on the validity of it perpetual lien, neither statute, case law,

nor contract supports the dangerously unbounded language of the 2009 lien. Oliveri's deceptive

1

and unlawful tactics over the course of years have driven Plaintiff to the brink of bankruptcy in her diligent attempts to pay what was asked. Its continued maintenance and fresh efforts to collect on a lien satisfied nearly a decade ago amount to nothing more than an illegal scheme to continue to squeeze Plaintiff and threaten her home. Moreover, Plaintiff's claims extend beyond the unlawfully maintained lien. Oliveri's suspect accounting includes attempts to collect numerous impermissible fees and charges, including its own outrageous fees.

Plaintiff's claims that Oliveri violated the FDCPA and the Maryland Consumer Debt Collection Act ("MCDCA") plainly clear the Rule 12(b)(6) bar. Likewise, Oliveri's misplaced attempts to undercut Plaintiff's unjust enrichment and declaratory judgment claims can gain no traction. Accordingly, Defendant's Motion to Dismiss or alternative premature Motion for Summary Judgment should be denied.

## FACTUAL BACKGROUND

### I.     Purchase of the Condominium and Wrongful Imposition of Towing Fees

In or around May 2007, Plaintiff purchased a condominium located at 462 Mainview Court, Glen Burnie, Maryland (the "Condominium"). Compl. ¶ 8. The Condominium is part of the Elvaton Towne Condominium Regime II ("Elvaton"). *Id.* at ¶ 9. Plaintiff regularly and timely paid monthly condominium assessments ("Assessments"). *Id.* at ¶ 10. In or around August 2008, Elvaton wrongfully towed Plaintiff's vehicle from the community's parking area and caused Plaintiff to incur approximately $200 for the costs of towing.[1] *Id.* at ¶¶ 11-12.

Due to the expense of the unlawful towing fees, Plaintiff was unable to pay her monthly

---

[1] Though Defendant attempts to imply that its parking enforcement and consequent towing fees were lawful, the Maryland Court of Appeals – in a case against this same condominium – held that the towing policy at issue was unlawful. *Elvaton Towne Condo. Regime II, Inc. v. Rose*, 453 Md. 684, 162 A.3d 1027 (2017).

assessment in that month and fell behind for a total of three months. *Id.* at ¶ 13. Oliveri began attempting to collect from Plaintiff in or around December 2008, claiming she owed more than $1,000, though the condominium had told her earlier that same month that she only owed $180. *Id.* at ¶ 14.

## II.    Decade of Unlawful Collection by Oliveri

Oliveri began regularly charging fees to Plaintiff as early as January 2009, with an initial charge of $951.87. *Id.* at ¶ 15. Over the next several years, Oliveri repeatedly agreed to payment plans with Plaintiff for a sum certain, inclusive of the assessments that were accruing during the payment period. *Id.* at ¶ 16. Plaintiff attempted, in good faith, to bring herself current numerous times. *Id.* at ¶ 17. In Sisyphean fashion, however, upon full payment of the agreed amount, Oliveri continued to demand thousands more in payment. *Id.* On one occasion, Plaintiff physically provided a check to Oliveri in the amount quoted, only to have him demand additional money thereafter. *Id.* at ¶ 18. Likewise, though Elvaton's records at times showed Plaintiff as current, or nearly so, Oliveri continued to maintain that Plaintiff had outstanding balances in the thousands of dollars. *Id.* at ¶ 19.

In addition, Oliveri regularly waited at least a month between receiving Plaintiff's payments and conveying them to Elvaton, and did not always credit Plaintiff for the full amount she had paid. *Id.* at ¶ 20. Oliveri's bills to Plaintiff included thousands in attorney's fees, in addition to separate "costs of collection" exceeding $1,000, as well as interest, late fees, and other charges. *Id.* at ¶ 21. Oliveri also charged Plaintiff insufficient funds fees, though no check was rejected by Plaintiff's bank, and she maintains overdraft protection to prevent such an occurrence. *Id.* at ¶ 22.

Oliveri applied Plaintiff's payments to these fees and charges before applying them to

any assessments, resulting in mounting late fees, interest, and other charges and putting Plaintiff into a state of perpetual delinquency despite her regular, exorbitant payments.[2] *Id.* at ¶ 23. Plaintiff was not permitted to make assessment payments directly to Elvaton from the time Oliveri began collection through the time of filing, so she was unable to avoid the mounting collection costs claimed by the Defendant. *Id.* at ¶ 24.   Nonetheless, Plaintiff went to such great lengths to make the excessive and unlawful payments demanded of her that she emptied her retirement account, became delinquent on other bills, removed her grandson from private school, and, at times, could not even afford groceries. *Id.* at ¶¶ 59-62.

Between July 2008 and the time of filing, Plaintiff's assessments totaled approximately $35,000, while her actual payments, through Oliveri, totaled nearly $50,000. *Id.* at ¶ 25.   Indeed, from in or around January 2009, Plaintiff was required to make all payments to Elvaton through Oliveri, resulting in perpetual legal fees for the purported cost of processing those payments that ultimately dwarfed any delinquent Assessments. *Id.* at ¶¶ 26-27.   Plaintiff would not have incurred *any* of the fees that rendered her delinquent without the wrongful towing charge. *Id.* at ¶ 28.

### III.   Oliveri's Unlawful Perpetual Lien

On or about January 22, 2009, Oliveri, on behalf of Elvaton, recorded a lien against Plaintiff's condominium for "$1,111.12, plus all sums becoming due thereafter, including but not limited to monthly assessments, special assessments, late fees, interest, and attorneys' fees, costs of collection, fines, violations and nonsufficient funds fees." *Id.* at ¶ 29; Compl.  Exh. A. The

---

[2] The Elvaton governing documents are silent regarding application of payments.  It is notable, however, that, in the case of judgments, Maryland law provides for payment of interest, then principal, then fees and costs, suggesting a standard that would minimize the accrual of additional fees.  Md. Code Ann., Comm. Law § 15-605(c).

lien states that it applies to purportedly delinquent assessments for the period of October 2008

through December 2008.  Compl. ¶ 30.

Elvaton's by-laws (the "By-Laws"), however, require a more limited approach:

> All assessments, until paid, together with interest on them and
> actual cost of collection, constitute a lien on the units on which
> they are assessed, *if a statement of lien is recorded within two
> years after the date the assessment becomes due*. The lien shall be
> effective against a unit from and after the time a Statement of
> Condominium Lien is recorded among the Land Records of the
> County where the unit is located, stating the description of the unit,
> the name of the record Owner, the amount due and the period for
> which the assessment was due. . . . On full payment of *the
> assessment for which the lien is claimed* the Unit Owner shall be
> entitled to a recordable satisfaction of the lien.

Compl. Exh. B, at pp. 20-21 (emphasis supplied).

No later than September 19, 2011—and, in reality, significantly earlier—Plaintiff had

paid off the assessments for October, November, and December 2008, so pursuant to the terms of

the By-Laws, Oliveri and Elvaton should have released the Lien by that time.  Compl. at ¶¶ 32-

33.  To the extent Plaintiff was delinquent on additional assessments after December 2008,

Oliveri and Elvaton failed to timely file additional liens within two years of the due date of the

subject assessments. *Id.* at ¶ 34.

In addition, Oliveri's account statements, including August 2017, regularly included a

$50 "lien release fees," but Oliveri took no steps to actually release the lien.  *Id.* at ¶ 35.

## IV.    Judgment and Satisfaction

On November 5, 2015, Oliveri, on behalf of Elvaton, filed a collection suit against

Plaintiff in the District Court for Anne Arundel County. *Elvaton Towne Condominium, Regime*

*II, Inc. v. Trice*, No. D-07-CV-15-011942.   On March 31, 2016, following a trial, the state court

entered a judgment against Plaintiff for $11,593.52, which included a principal amount of

$7,617.66, prejudgment interest of $2,576.12, and attorney fees of $1,145.00, as well as post-

judgment interest.  Compl.  ¶¶ 38-39.

Plaintiff made arrangements with Oliveri to pay down the judgment over time,

and made five payments of $604.00 to Oliveri between May and December 2016.  *Id.* at ¶ 39.

In or around February 2017, Oliveri sought and later obtained Writs of Garnishment against

Plaintiff's bank account and wages.  *Id.* at ¶ 41.  The bank garnishment was ultimately dismissed.

*Id.* at ¶ 42.  Through the wage garnishment, in 2017, Oliveri collected 17 payments of $484.84

and one payment of $134.20.  *Id.* at ¶ 43.  At the end of 2017, Plaintiff had paid $11,696.48, to

Oliveri for the judgment, and a balance of $938.62 purportedly remained.  *Id.* at ¶ 44.  Oliveri

sought an additional Writ of Garnishment in April 2018.  Plaintiff filed a motion opposing the

writ, which the Anne Arundel County court denied without any additional written opinion.  *See*

Hearing Comments, attached hereto as Exh. A.  Plaintiff made the remaining payment before any

additional funds were garnished.  Compl. ¶ 45.

Neither the original judgment nor the court's ruling on the garnishment indicated that the

judgment was secured by the Lien.  Oliveri Mem. Eh. 14; Opp. Exh. A.  To the contrary, the

2015 judgment explicitly stated that Oliveri "may file for a lien on any real property owned by

the defendant(s) to enforce this judgment."  Oliveri Mem. Exh. 14.

While Oliveri was garnishing Plaintiff's wages or receiving payments from her on the

judgment, it failed to send her regular statements of account reflecting an updated balance or

application of payments, as required by Md. Code Ann., Comm. Law § 15-605(a). *Id.* at ¶ 46.

47. Those few statements that Oliveri sent in response to requests from Plaintiff's counsel indicated wildly inconsistent accounting. *Id.* at ¶ 47.  For example, a statement in August 2017 showed a remaining balance on the Judgment of $4,434.44, while a statement reflecting only about $1,200 in additional payments four months later showed a balance of $938.62. *Id.* at ¶ 48.

Finally, on or about May 1, 2019, Defendants filed a Notice of Satisfaction of the Judgment.  *Id.* at ¶ 49.

**V.      Unlawful Post-Judgment Collection**

The satisfaction of judgment did not, however, prompt Oliveri to cease collection efforts or to release the lien.  *Id.* at ¶ 50.  During the time Oliveri was garnishing Plaintiff's wages, then-counsel for Plaintiff negotiated lump-sum payments of post-judgment assessments to be paid after the garnishment ended.  *Id.* at ¶ 51.

Plaintiff timely made the lump-sum payments, totaling $5,065 for only $2,340 in assessment, and has been making timely monthly payments to bring herself current on the assessments as of the time of filing.  *Id.* at ¶ 51.  Nonetheless, as of the time of filing, Plaintiff was still required to make her payments through Oliveri.  *Id.*at ¶ 52.  As of March 2019, Oliveri claim entitlement to "post-judgment amounts" of $9,101.02, with a total balance purportedly secured by the lien of $10,109.64.  The "post-judgment amounts" include $7,480.50 in attorney's fees, in addition to the attorney's fees that were included in the Judgment. *Id.* at ¶ 53.  *See* Mot. Exh. 22 ("March 2019 Letter").  During the court proceedings, Oliveri had filed a motion for sanctions and attorney's fees in connection with Plaintiff's exercise of her right to challenge the garnishment.  Mot. Exh. 15 (May 4, 2018 entry).  Though the court did not grant Oliveri's motion, it appears that Oliveri may have included those fees on its post-judgment account

statements.  Opp. Exh. A.  The attorney's fees claimed as "post-judgment amounts" certainly do not relate to the October-December assessments that form the basis of the Lien.  Compl. at  ¶ 56.

Though Oliveri had no valid security interest in the post-judgment amounts—or valid right to collect them at all— in or around July 2019, Oliveri posted a Notice of Intent to Foreclose on the Lien on Plaintiff's door and continues to pursue collection.  *Id.* at ¶ 58.

## VI.     Damages

Oliveri's excessive and unlawful collection have had significant impacts on Plaintiff's emotional and financial health.  *Id.* ¶¶ 60-63.  Most recently, with a threatened foreclosure and collection in excess of $10,000, she has been unable to make necessary repairs to her home and has suffered severe emotional distress, manifest in symptoms including, but not limited to, loss of sleep, increased blood pressure, and anxiety.  *Id.* at ¶ ¶60, 63.

## ARGUMENT

## I.     Standard of Review

### A.  Standard of Review for a Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   A plaintiff need not prove his case in the complaint: "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," a level higher than possibility but lower than probability.  *Id.*  The Court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the

plaintiff." *Ibarra v. United States,* 120 F.3d 472, 474 (4th Cir. 1997).

**B.  Standard of Review for a Motion for Summary Judgment**

Under Federal Rule of Civil Procedure 56(a), summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration and quotation marks omitted); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Issues involving credibility, motive and intent are inappropriate for resolution on a motion for summary judgment.  *Hardin v. Pitney-Bowes Incorp.*, 451 U.S. 1008, 1008-09 (1981).  "It is equally clear that where such issues are presented, the submission of affidavits or depositions is insufficient to support a motion for summary judgment." *Id*.

Pursuant to Fed. R. Civ. P. 56(d), if a nonmoving party shows that it cannot present facts essential to oppose a motion for summary judgment, a court may defer considering the motion, deny the motion, and/or allow time to take discovery.  Rule 56(d) motions "are 'broadly favored and should be liberally granted' in order to protect non-moving parties from premature summary judgment  motions." *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 484 (4th Cir. 2014) (quoting *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013)).  Indeed, "[a] court should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

**II.     Summary Judgment Is Inappropriate at This Stage of the Proceedings**

Oliveri's broad statements of entitlement to maintain a lien and collect from Plaintiff

gloss over numerous factual issues that are central to the resolution of this case.  Specifically, as detailed in the attached affidavit of counsel pursuant to Fed. R. Civ. P. 56(d), material issues requiring discovery include, but are not limited to:  the extent of Plaintiff's initial and ongoing indebtedness; the accuracy of Oliveri's account statements and the fees therein; the scope of any payment plan and Plaintiff's compliance therewith; Oliveri's application, disbursement, and retention of Plaintiff's payments; Oliveri's procedures to ensure the integrity of its collections; and, significantly, Oliveri's knowledge and intent to violate the MCDCA.

At this stage in the litigation, Plaintiff has not had the opportunity to seek discovery from Oliveri, Elvaton, or any third party, has not had the opportunity to inquire into the factual issues raised by Oliveri's exhibits, and has not had the opportunity to depose any relevant parties or witnesses. Oliveri's purported entitlement to judgment as a "matter of law" thus in reality rests on disputed and unexamined factual assertions.[3]  Not only are such assertions untested through the discovery process; many of these quintessentially factual issues that would render summary judgment inappropriate even *after* discovery.  Fed. R. Civ. P. 56(d); *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012) (summary judgment generally inappropriate where the parties have not had the opportunity for reasonable discovery); *Hardin v. Pitney-Bowes Incorp.*, 451 U.S. 1008, 1008- 09 (1981).

As set forth in the attached affidavit, alleged errors and misrepresentations in Oliveri's accounting and collections practices are central to several of Plaintiff's allegations.  Oliveri cannot merely submit its own account statements to the Court as infallible and dispositive. Plaintiff must have the opportunity to look behind them, compare them to the records of Elvaton

---

[3] To the extent legal questions are relevant here, as set forth below, they nonetheless do not entitled Oliveri to summary judgment and may, at the appropriate stage in litigation, entitle *Plaintiff* to summary judgment.

and others, and otherwise test the accuracy and integrity of the statements and Oliveri's

processes.  Neither the Court nor Plaintiff need take Oliveri's word; indeed, the legal system

relies on parties' ability to examine factual assertions in discovery. Plaintiff is entitled to test the

veracity of Oliveri's assertions through discovery, a process that has not even begun.  *Greater*

*Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d

264, 280 (4th Cir. 2013) (reversing a grant of summary judgment that occurred prior to the

nonmoving party taking discovery on the contested issues, and stating, a court "must refuse

summary judgment where the nonmoving party has not had the opportunity to discover

information that is essential to its opposition") (internal citations and quotations omitted).

Likewise, Oliver's knowledge is not only uniquely within its control but also a matter of

credibility.  Even after discovery, the question of knowledge likely remains a question for

determination at trial by the finder of fact.  *Hardin v. Pitney-Bowes Incorp.*, 451 U.S. 1008,

1008- 09 (1981) (holding that questions of credibility, motive and intent are left for the fact

finder to decide).

Accordingly, Plaintiff respectfully requests that this Court deny Defendants' Motion, and

allow the parties to proceed with discovery.

**III.    Plaintiff's FDCPA Claim is Timely**

Oliveri's attempt to manufacture a statute of limitations issue runs counter to the facts of

this case and to the weight of the vast majority of authority on the issue, including a recent

decision by this Court.  Oliveri has "the burden of establishing that the time bar is apparent on

the face of the complaint," and has failed to do so here: though Plaintiff provided the factual

background of her interactions with Oliveri, her FDCPA claim[4] specifically focused on Oliveri's

collection efforts and foreclosure attempt that followed the satisfaction of judgment. *Ellis v.*

*Palisades Acquisition XVI LLC*, No. JKB-18-03931, 2019 U.S. Dist. LEXIS 124787, at *12 (D.

Md. July 26, 2019).

### A.  Courts Have Rejected the "Same Type" Statute of Limitations Analysis

As an initial matter, every federal appeals court to address the statute of limitations

argument raised by Oliveri has rejected that position, and has held that the FDCPA's statute of

limitations does not bar a claim for conduct occurring within one year prior to the complaint

filing, even if the same type of violations occurred prior to the one year period.

The Eighth Circuit recently held:

> If a debt collector violates the FDCPA, an individual may sue to
> enforce FDCPA liability within one year of that violation. It does
> not matter that the debt collector's violation restates earlier
> assertions—if the plaintiff sues within one year of the violation, it
> is not barred by § 1692k(d). Each alleged violation of the FDCPA
> is evaluated individually to determine whether any portion of the
> claim is not barred by the statutes of limitations.

*Dermarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 694 (8th Cir. 2017).  *See also Solomon v.*

*HSBC Mortg. Corp.*, 395 Fed.Appx. 494, 497 (10th Cir. 2010) (rejecting "same type" argument

and concluding that "for statute-of-limitations purposes, discrete violations of the FDCPA should

be analyzed on an individual basis"); *Purnell v. Arrow Financial Services, LLC* 303 Fed.Appx.

297, 301 (6th Cir. 2008) ("to the extent that plaintiff can prove that such violations occurred

within the limitations period, they are not time-barred").

---

[4] The references in paragraphs 67 and 69 of the Complaint to 15 U.S.C. § 1692d(1) were
typographical errors and should reference Section 1692f(1).  Plaintiff would be happy to file a
correction, should the Court request that she do so.

Though the Fourth Circuit has not yet addressed the issue directly, its recent decision in an unpublished opinion rejects the argument raised by Oliveri, noting that "[o]rdinarily, the statute of limitations begins to run when the communication that violates the FDCPA is sent. Here the statute of limitations does not bar those portions of [the plaintiff's'] FDCPA claims . . . that seek recovery based on communications" sent within one year of filing. *Richardson v. Shapiro & Brown, LLP,* 751 Fed.Appx. 346, 349 (4th Cir. 2018). *Cf. Boccone v. American Express Co.*, 2007 WL 2914909, *4 (D. Md. Oct. 4, 2007) (holding that each violation of the FDCPA commences an independent statute of limitations period); *Akalwadi v. Risk Mgmt. Alternatives, Inc.*, 336 F.Supp.2d 492, 501 (D.Md. 2004) (holding that violations that occurred within the statute of limitations window were not time-barred, even if the defendant had previously violated the same section of the FDCPA outside of the limitations window).

Defendants' argument, therefore, rests solely on non-binding precedent that contradicts the interpretations of nearly every court to address the issue.

### B.  Defendant's Violations Were Discrete Acts That Occurred for the First Time in 2019

Even assuming the "same type" analysis of the statute of limitations applies, the violations alleged in Plaintiff's Complaint are distinct from those for which Plaintiff purportedly had notice. *See Ellis v. Palisades Acquisition XVI LLC*, No. JKB-18-03931, 2019 U.S. Dist. LEXIS 124787, at *14 (D. Md. July 26, 2019) ("[E]ven the courts that hold that the statute of limitations is not restarted by a repetition of the violation in the state court complaint or summons do not apply that approach where the violations within the statute of limitations are a different type from the time-barred FDCPA violations.") (quoting National Consumer Law Center (NCLC), Foreclosures and Mortgage Servicing §§ 12.3.4.4 (5th ed. 2014)).

Contrary to Defendant's characterization, Plaintiff's claims arise now from a challenge to

the validity of the lien to 0Oliveri's collection efforts.  Specifically, Plaintiff's FDCPA claims

relate to (1) efforts to collect, by letter or foreclosure threats, unauthorized post-judgment

amounts; (2) following the satisfaction of judgment and concordant release of any garnishment

order, the threat to foreclose on Plaintiff's home without a valid security interest, and (3)

collection or purported collection of a lien release fee without the release of a lien.  Each

violation alleged constituted distinct actions that occurred for the first time within one year prior

to the filing of the complaint, and are not of the same "type" as Oliveri's prior violations.

This Court's recent ruling in *Ellis v. Palisades Acquisition* highlights the application of

the FDCPA's statute of limitations to shifting collection tactics.  *Ellis v. Palisades Acquisition*

*XVI LLC*, No. JKB-18-03931, 2019 U.S. Dist. LEXIS 124787 (D. Md. Jul. 26, 2019).  There, the

Court considered collection activity that occurred on a judgment debt after the purported release

of that debt.  *Id.*  The Court found that the plaintiff had alleged that he reasonably believed that

the debt had been released, rendering future attempts to collect on the released debt a new

violation.  *Id.* at •14.  The case at bar presents an even more compelling argument that the

collection is of a different type, as the amounts Oliveri seeks to collect are entirely different from

those collected under the judgment, and the collection methods different in nature.

As to the post-judgment amounts and fees, none of the exhibits put forth by Oliveri prior

to the March 2019 letter indicates a post-judgment amount due.  That letter plainly falls within

the limitations period.  Even if prior correspondence had shown post-judgment amounts, Plaintiff

entered into an agreement to pay them off.  Her Complaint challenges efforts to collect amounts

over and above that agreed and paid, as well as the accuracy of the fees charged.  Such payments

and the subsequent collection efforts also occurred in 2019.

Likewise, Oliver's representations of a security interest, though it may have made such

14

claims previously, are categorically distinct from those at issue here.  Most significantly, the threat of foreclosure on the purported security interest is wholly different in character from the lawsuits for monetary damages brought previously, and was, in fact, Oliveri's first effort to attempt to enforce the invalid Lien.  The "definitive action taken by Defendants that is alleged to constitute an abusive debt collection practice" was *not* the filing of the lien itself but the threat to enforce it on amounts that it did not properly secure and to collect on amounts Plaintiff did not legally owe.  *Fontell v. Hassett*, 870 F. Supp. 2d 395, 404 (D. Md. 2012).

The existence of a procedure to challenge the Lien at the outset has no bearing on Oliveri's 2019 attempt to exercise supposed rights under the Lien.  Indeed, the existence of separate procedures to challenge the foreclosure of a lien only highlights the distinction. Md. Code Ann., Real Pro. § 14-204(a) (providing for foreclosure "subject to the same requirements" as the foreclosure of mortgages and deeds of trust); § 7-105.1 (setting forth foreclosure procedures for mortgages and deeds of trust).  Even if, therefore, Plaintiff did not challenge the lien at the time it was recorded, nothing prevents her from challenging Defendant's use of that lien in foreclosure threats or other efforts.

In addition, even if Oliveri had previously referenced amounts purportedly secured by the Lien, as in *Ellis*, the intervening judgment, satisfaction, and completed payment plan gave Plaintiff every reason to believe that no allegedly secured interest remained.  To wit, the judgment itself stated that Oliveri *could* obtain a lien to secure the judgment, not that any Lien already secured it. Oliveri did not inform Plaintiff that it included post-judgment amounts as secured by the Lien until the March 2019 letter.  To the contrary, it referenced the release of a lien.  The statute of limitations, therefore, presents no obstacle to Plaintiff's FDCPA claims.

## IV.    Defendant Has No Right to Enforce a Perpetual Lien

### A. *Archie v. Nagle & Zaller P.C.* Does Not Allow a Lien on Future Assessments

Oliveri puts the majority of its eggs in the basket of *Archie v. Nagle & Zaller, P.C.,* No. GJH-17-2524, 2018 U.S. Dist. LEXIS 120482 (D. Md. Jul. 19, 2018). Yet *Archie* simply does not say what Defendant wants it to say. In *Archie*, this Court considered liens that purported to secure "additional fines, late fees, interest, costs of collection and attorney's fees actually incurred, if any, as permitted by the Association's governing documents that may come due after the date this lien was drafted." *Id.* at *14. Each category of potential increases or decreases in the *Archie* liens relates directly to the assessments secured by that lien, or payments made thereon. The liens in *Archie* do *not* include future assessments, nor does the holding in that case indicate that such an extension would be appropriate. Though the *Archie* court cautions about the need to file a new lien each day to reflect the accrual of interest, no such burden attends the (statutorily mandated) filing of liens for different assessment periods to comply with the statute of limitations. *Id.* at •16. Indeed, Oliveri could easily have grouped months, or even years, of purportedly delinquent assessments into a single lien, as it did in the instant Lien, to further reduce the burden.

Likewise, the *Archie* Court noted the predictability of the accrual of interest and fees based on the applicable by-laws. No such predictability attaches to the Lien here. As an initial matter, the assessment amount varies over time, as would the applicable interest and fees if the "principal" to which they apply keeps shifting, in contrast to the fixed "principal" considered in *Archie. See* Mot. Exh. 2, at pp. 18 (stating that "[t]he Board of Directors shall define the amount of the assessment annually, but may do so at more frequent intervals should circumstances so require" and providing for 30 days advance notice of the amount). The By-Laws also provide for "special assessments," which are, by definition, unpredictable but would nonetheless fall within Oliveri's expansive lien. *Id.* at pp. 18-19.

Moreover, the By-Laws here state:

> All assessments, until paid, together with interest on them and
> actual cost of collection, constitute a lien on the units on which
> they are assessed, if a statement of lien is recorded within two
> years after the date the assessment becomes due. The lien shall be
> effective against a unit from and after the time a Statement of
> Condominium Lien is recorded among the Land Records of the
> County where the unit is located, stating the description of the unit,
> the name of the record Owner, the amount due and the period for
> which the assessment was due. . . . On full payment of the
> assessment for which the lien is claimed the Unit Owner shall be
> entitled to a recordable satisfaction of the lien.

*Id.* at pp. 20-21.  The By-Laws specifically require that the lien state the period for which the

assessments are due and states that "full payment of the assessment *for which the lien is claimed*"

will result in satisfaction.[5]  *Id.* (emphasis supplied).  In other words, though a lien under the By-

Laws may include other charges related to the subject assessments, only the enumerated

assessments may constitute the basis for the lien.[6]  The By-Laws further require recordation of

the lien "within two years after the date the assessment becomes due," a proviso that would be

meaningless if the lien could secure future assessments.  *Archie*, therefore, has no applicability to

the case at bar.

---

[5] To the extent the language of the By-Laws may be considered ambiguous, it would be
construed against Elvaton and its agent, Oliveri.  *People's Ins. Counsel Div. v. State Farm Fire
& Cas. Co.*, 442 Md. 55, 63, 109 A.3d 1208, 1213 (2015) ("No one questions that Maryland
abides by the "construe against the drafter" principle of contract interpretation.")

[6] Defendant's reliance on sixty-year old mortgage advance cases is similarly misplaced.
Mortgage and nonmortgage liens operate under distinct statutory schemes.  As discussed below,
the MCLA does not provide for the inclusion of future assessments.  In contrast, Maryland's
mortgage statute, in an amendment post-dating all the cases cited by Defendant, explicitly allows
them and relates them back to the date of the mortgage for purposes of priority.  Md. Code Ann.,
Real Prop. § 7-102(b).  Had the Legislature wished to include a similar provision in the MCLA,
it could have done so.  Its absence, therefore, can only be interpreted to indicate that future
assessment advances cannot be included in an MCLA lien.  *See Balt. Harbor Charters v. Ayd*,
365 Md. 366, 385, 780 A.2d 303, 314 (2001) ("We have long applied the principle of statutory
construction, '*expressio unius est exclusio alterius*'--the expression of one thing is the exclusion
of another.")

**B.  The MCLA Does Not Permit Perpetual Liens**

The same analysis is true under the Maryland Contract Lien Act ("MCLA") itself.  The statute provides sample language for assessments secured by a lien:

> The amount of the regular monthly assessments, or the equivalent of the regular monthly assessments, for common expenses, that is the basis of the priority portion of this lien as provided in § 11-110(f) or § 11B-117(c) of the Real Property Article, is $ .........…
> This sum represents .........months of unpaid regular assessments, at $ .........per month.

Md. Code Ann. Real Prop. § 14-203(j)(2).  The MCLA prescribes such language because the General Assembly believed that homeowners had a right to know exactly what was claimed to be due and owing. Had the MCLA contemplated the inclusion of future assessments in a lien, it would not have required a sum certain that relates to a specific number of monthly assessments.

The MCLA "specifies that a lien is to secure 'damages' and related costs — *i.e.*, the monetary remedy for a breach of contract. Thus, a lien under the statute always relates to a breach of the contract." *Select Portfolio Servicing v. Saddlebrook W. Util. Co.*, 455 Md. 313, 335, 167 A.3d 606, 619 (2017).  A failure to pay assessments other than those enumerated in a filed lien constitutes a separate breach, requiring a separate lien.[7]  *See Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 Fed. App'x 552, 557-58 (4th Cir. 2015) (finding multiple breaches for repeated conduct); *MacBride v. Pishvaian*, 402 Md. 572, 584, 937 A.2d 233 (2007) (same), *abrogated on other grounds by Litz v. Md. Dep't of the Env't,* 434 Md. 623 (2013).  As with the By-Laws, the two-year statute of limitations provided in Md. Code Ann., Real Prop. § 14-203(a)(1) would be meaningless if a lien could include assessments arising from

---

[7] Plaintiff makes no admission as to any breach or debt.

*future* breaches.  It is axiomatic that a statute must be interpreted to give effect to each provision. Oliveri's evasion of the statute of limitations therefore cannot hold.

To set an infinite due date for the assessments on which costs and interest are based "would stretch the boundaries of the statute, as well as due process. *See Select Portfolio Servicing v. Saddlebrook W. Util. Co.*, 455 Md. 313, 335-36, 167 A.3d 606, 619 (2017) ("the primary purpose of the Act was to provide procedures that comported with constitutional requirement of procedural due process.")  Oliveri's proffered expansion of the statute would deny consumers their due process rights to challenge a lien as it relates to a specific set of damages arising from a specific breach. *See Golden Sands Club Condominium, Inc. v. Waller*, 313 Md. 484, 493 (1988) ("Under the Contract Lien Act, no lien attaches until after the [property] owner has had an opportunity to be heard").  Whether or not Plaintiff has a defense to a lien on the original assessments indicated in the Lien cannot affect her defenses to future assessments that may arise—defenses that would likely not present themselves until the future assessments were due.  Such concerns are even more acute for fees and other charges based on those future assessments.  Yet the language of the Lien would deny Plaintiff the right to be heard except when facing a foreclosure.  Neither the MCLA nor the mandates of due process can sanction such an approach.

**C.  Oliveri Further Violated the FDCPA by Collecting Unauthorized Amounts**

In addition to the deceptiveness and unfairness of the representations that Oliveri had a secured interest under the Lien, a number of the post-Judgment charges themselves fall outside those authorized by the By-Laws or statute. Specifically, Plaintiff has alleged that she never had any returned checks and maintained protection with her bank against such an occurrence. Compl. ¶ 22.  Nonetheless, Oliveri's March 2019 letter references $105 due for non-sufficient

funds fees.  Likewise, as discussed below, Oliveri was not entitled to bill repeatedly for a lien release fee not yet incurred.

Most notably, the MCLA was amended four years after Defendant filed its Lien to prohibit the inclusion of attorney's fees in a homeowners' association lien except those "directly related to the filing of the lien and that do not exceed the amount of delinquent assessments." Md. Code Ann., Real Prop. § 14-204(d)(2)(i)(2).  Had Oliveri properly filed liens within two years of the due date of the purportedly delinquent assessments, therefore, it would have had a right to only a small fraction, if any, of the $7,000 in fees to which it now claims entitlement. Defendant now attempts to grandfather into its pre-amendment lien assessments that would have been subject to the amended statute.  Such tactics appear nothing more than an illegal scheme to bootstrap its own now-prohibited fees.

Likewise, even leaving aside the MCLA's prohibition on most attorney's fees, the exorbitant amount Defendant seeks to collect raises alarm bells.  The Judgment included all attorney's fees through March 2017.  Though Oliveri sought additional fees during the course of the proceeding, the Court did not allow them.  Opp. Exh. A. Yet its collection efforts somehow amounted to more than $7,000 worth of time.  Either Oliveri has ignored the preclusive effect of the Anne Arundel court's ruling on its entitlement to fees from the garnishment proceedings, has charged unreasonable amounts, or both.  Under any circumstances, Plaintiff has adequately alleged a violation and is entitled to explore the specific through discovery.

Oliveri therefore has no defense under the By-Laws, Maryland statute, or case law for to its perilous "perpetual lien" argument or its suspect collection methods, and its motion to dismiss or for summary judgment on Plaintiff's FDCPA claim should be denied.  As Plaintiff's FDCPA

claim must stand, this Court may exercise supplemental jurisdiction over the remainder of her claims.

## V.        Defendant Violated the MCDCA

For all of the reasons Oliveri has no defense to Plaintiff's FDCPA claim, it has no cover for her MCDCA claim as to its attempts to enforce an invalid lien or the collection of improper amounts.  Plaintiff's other MCDCA claims should survive similarly unscathed.[8]

### A.  Defendant Violating the MCDCA by Purporting to Collect a Lien Release Fee

Defendant's argument regarding collection of the lien release fee is perplexing.  Agreeing that no lien was in fact released, Oliveri asserts that it therefore did not collect a lien release fee and cannot be liable.  Yet multiple letters, over the course of years, including the March 2019 letter, includes a $50 charge for a "Lien Release Fee."  Whether and how many times Oliveri actually collected the fee is an issue for discovery.  At this stage, however, the Court need not accept Oliveri's protestations of innocence.

### B.  Defendant's Knowledge of a Violation Is an Issue of Fact

Oliveri's final effort to evade the MCDCA rests on a disclaimer of knowledge of the unlawfulness of its actions.  Knowledge, however, is a quintessential issue of fact, inappropriate not only for a motion to dismiss but for a post-discovery motion for summary judgment.  *Hardin v. Pitney-Bowes Incorp.*, 451 U.S. 1008, 1008- 09 (1981) (holding that questions of credibility, motive and intent are left for the fact finder to decide).  Oliveri indicates that the burden of proving knowledge lies with Plaintiff yet would deny her even the opportunity for discovery on

---

[8] Though Oliveri plainly failed to comply to Maryland law in providing monthly statements that showed the application of Plaintiff's payments and garnishments, Plaintiff will not pursue her MCDCA claim based on its unlawful garnishments.

this intensely factual issue. Moreover, "the term 'knowledge' in the Act does not immunize debt collectors from liability for mistakes of law." *Spencer v. Hendersen-Webb, Inc.*, 81 F. Supp. 2d 582, 594 (D. Md. 1999).

In addition, Md. Code Comm. Law § 14-202(11) establishes an automatic violation of the MCDCA where there is a violation of the FDCPA.  That prong of the MCDCA does not include a knowledge requirement, and the FDCPA itself is a strict liability statute.  *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 389 (4th Cir. 2014) ("The FDCPA imposes liability without proof of an intentional violation.")

Neither summary judgment nor dismissal would, therefore, be appropriate based on Oliveri's knowledge of its violations.

### VI.   Plaintiff Properly Stated a Claim for Unjust Enrichment

Oliveri presents a similarly clear question of fact as to whether Plaintiff paid any money directly to Defendant. Likewise, it is not at all apparent that Defendant conveyed Plaintiff's money to Elvaton at all or at least timely.  Plaintiff explicitly plead that "Oliveri regularly waited at least a month between receiving Plaintiff's payments and conveying them to Elvaton, and did not always credit Plaintiff for the full amount she had paid."  Compl. ¶ 20. Without discovery as to how Defendant received and disbursed Plaintiff's payments, the question of direct benefit cannot be determined.  Indeed, Oliveri itself notes that an unjust enrichment claim requires a showing that defendant "actually took possession of [the] funds." *Jason v. Nat'l Loan Recoveries, LLC*, 227 Md. App. 516, 533 (2016).  Yet Oliveri believes itself entitled to prevail on this claim without even providing Plaintiff the opportunity to determine whether it took possession of all or part of her payments.

Even if Plaintiff did not pay Oliveri directly, Defendant explicitly billed her for its services, including legal fees on each and every invoice. Where Oliveri has repeatedly sent Plaintiff collection statements including thousands of dollars in attorney's fees, it is at best disingenuous to disclaim any benefit from its relationship with Plaintiff. Oliveri does not and cannot make any showing that it received no benefit from Plaintiff, nor can it show any requirement for direct payment by Plaintiff to Defendant for this equitable claim. Whether Plaintiff paid those fees directly to Oliveri or paid them to Elvaton for the benefit of Oliveri, she conferred a benefit on Oliveri to which it was not entitled.

## VII.    Plaintiff Is Entitled to Pursue Her Claim for Declaratory Judgment

Defendant also appears to misunderstand the requirements of a declaratory judgment action, framing it as a remedy to the equitable and statutory violations in Plaintiff's other counts. Yet the Declaratory Judgment Act includes no such requirement, mandating only a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941). Indeed, the fact that declaratory judgment actions may be brought without any additional causes of action highlights the independence of Plaintiff's request for relief.

Plaintiff here has an active case or controversy *against Oliveri* entitling her to maintain a declaratory judgment action against it. "A direct threat to sue, or claim of infringement against, the declaratory judgment plaintiff is not necessary for the existence of an actual controversy for purposes of the Declaratory Judgment Act." *Glaxo Wellcome v. Pharmadyne Corp.*, CIVIL NO. AMD-96-455, 1996 U.S. Dist. LEXIS 10959, at *19-20 (D. Md. July 23, 1996). Rather, "an actual controversy exists under the Declaratory Judgment Act when a plaintiff seeks declaratory

relief in order to avoid the accrual of potential damages for past actions," here, the accrual of attorney's fees. *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 593-94 (4th Cir. 2004).   *See also Carter v. Am. Note Servicing*, Civil Action No. 5:14cv00003, 2014 U.S. Dist. LEXIS 67142, at *5-7 (W.D. Va. May 14, 2014) (plaintiff states a claim for declaratory judgment against a foreclosure law firm because "Atlantic Law has, with others, initiated foreclosure proceedings on [plaintiff's] home, which were only cancelled with the filing of this action").  Here, as in *Carter*, Plaintiff reasonably feared foreclosure or other further collection actions *by Oliveri*.  She is, accordingly, entitled to maintain her declaratory judgment claim.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment be denied.

Dated: February 3, 2020

Respectfully submitted,

LAW OFFICE OF COURTNEY WEINER PLLC

*/s/ Courtney L. Weiner*
Courtney L. Weiner (#19463)
1629 K St., NW, Suite 300
Washington, DC 20006
Telephone:  (202) 827-9980
cw@courtneyweinerlaw.com

Elizabeth L. Morris (#28493)
Adams, Morris and Sessing
12850 Middlebrook Road, Suite 308
Germantown, MD 20874
PH: 301-637-0143
lee@amslawgroup.com

*Attorneys for Plaintiff*

**<u>Certificate of Service</u>**

I certify that on this 3rd day of February 2020, the foregoing Opposition to Defendants'

Motions to Dismiss was served via CM/ECF on all counsel of record.

<u>*/s/ Courtney L. Weiner*</u>